FILED

2016 Nov-18  PM 03:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

DANIEL BARTHOLOMEW CLARK,   )
                                    )
       Plaintiff,             )
                                      )
v.                                )     Case No. 2:16-cv-00920-MHH-TMP
                                      )
GUY NOE, et al.,              )
                                      )
       Defendants.      )

## REPORT AND RECOMMENDATION

The plaintiff filed a *pro se* complaint and amended complaint pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated by the defendants during his incarceration at Decatur Work Release, in Decatur, Alabama. (Docs. 1 and 8). The plaintiff names as defendants Guy Noe, Bradley Howard, Steven Johnson, Nathaniel Odell,[1] Jeremy Rice, and Scott Raper. (Doc. 8 at 1). The plaintiff seeks compensatory and punitive damages.[2] (*Id.* at 4). In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

---

[1] The court has adopted the spelling of defendant Odell's name from defendant Odell's affidavit, rather than the spelling used by the plaintiff in his complaint.

[2] Although the plaintiff also seeks an order requiring Corizon Health to have 24 hour medical staff on duty at all work release/work camps (doc. 8 at 4), Corizon Health is not a party to this action.

# I. Procedural History

On July 1, 2016, the court entered an Order for Special Report directing that copies of the complaint and amended complaint be forwarded to each of the named defendants and that the defendants file a special report addressing the factual allegations contained therein.  (Doc. 9).  The court advised the defendants that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, the court would considered it as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (*Id.*).  The order advised the plaintiff that, after he received a copy of the special report, he would have twenty-one days to file his initial disclosures pursuant to Rule 26(a)(1), Federal Rules of Civil Procedure.  (*Id.*).

On August 30, 2016, the defendants filed a special report, supplemented by affidavits and other evidence.  (Doc. 13).  That same date, the parties were notified that the court would construe the special report as a motion for summary judgment and the plaintiff was notified that he had twenty-one (21) days to respond to the motion for summary judgment, by filing affidavits or other material.  (Doc. 14).  The court also advised him of the consequences of any default or failure to comply with Fed. R. Civ. P. 56.  (*Id.*).  *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th

Cir. 1985).  On September 15, 2016, the plaintiff filed a response to the motion for summary judgment, supported by affidavits and other evidence.[3]  (Doc. 16).

This matter is now before the court on the defendants' motion for summary judgment (doc. 15), and the plaintiff's response thereto (doc. 16).

## II. Standard of Review

Because the court has construed the defendants' special report as a motion for summary judgment, Rule 56, Federal Rules of Civil Procedure, governs the resolution of the motion.  Under Rule 56(a), Fed.R.Civ.P., summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000).  The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir.

---

[3]  The plaintiff also submitted "Additional Documentation" (docs 17 and 18) on September 21, 2016.  This documentation consists of a series of photographs of the plaintiff's face, which the plaintiff asserts "show that the swelling was worse [than] the pictures that the Defendants took which were the first photos around 7:19 a.m. . . ."  (Doc. 18).  However, in addition to being blurry, these photographs provide no indication as to when they were taken, where they were taken, or by whom they were taken.  They do not appear to be from the cell where the plaintiff was housed during the relevant time period.  As such, the court has not considered these photographs.

1991).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted].  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532.

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment.  *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)).  Additionally, because the plaintiff is pro se, the court must construe the complaint more liberally than it would pleadings drafted by lawyers.  *Hughes v. Rowe*, 449 U.S. 5, 9 (1980).  "*Pro se* pleading are held to a less stringent standard than pleadings drafted by attorneys and will,

4

therefore, be liberally construed."  *Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006).

### III. Summary Judgment Facts

On March 6, 2016, while incarcerated at Decatur Work Release, the plaintiff was in a physical altercation with another inmate.  (Doc. 1 at 3; doc. 13-2 at 2). Although plaintiff indicated to other inmates that he had been kicked in the head, there is no evidence that this was reported to or known by any of these defendants. The plaintiff was then placed in lock-up without medical attention for several hours.  (*Id.*, at 5; doc. 13 at 3-4).  The incident report reflects the altercation occurred at approximately 7:15 a.m., and the plaintiff was taken to lock-up at 8:10 a.m., based on Warden Guy Noe's instructions.  (Doc. 13-2 at 2).

The parties dispute what occurred between the time the plaintiff was placed in lock-up and when he was transported to Limestone Correctional Facility for medical treatment, somewhere around 12:15 p.m.   According to the plaintiff, because he was going in and out of consciousness, he and other inmates told defendant Sgt. Bradley Howard, the shift supervisor, that he needed medical treatment.  (Doc. 1 at 3, 5).  The warden, defendant Guy Noe, instructed Sgt. Howard to leave the plaintiff in lock-up until a nurse came in, even though that was two hours away.  (*Id.*).  Other inmates in the cell tried to get the attention of defendant officer Steven Johnson, but Johnson told the inmates to stop yelling and

blocking the cameras. (*Id*., at 5).   The inmates asked Johnson to look at the plaintiff, but he responded "I don't care," and told the inmates if they blocked the camera they would be written up.  (*Id*.).

At some point the plaintiff crawled to the speaker on the wall and told them "something wasn't right." (Doc. 1 at 5).   Moments later he had a seizure and blanked out.  (*Id*.).   When he came to, defendant officers Scott Raper and Jeremy Rice were standing around him.  (*Id*.).   Raper said he and Rice had rolled the plaintiff onto his side because of the seizure. (*Id*.).   After another hour, the plaintiff was taken to Limestone Correctional Facility's medical unit.  (*Id.*).

The plaintiff submits the affidavits of two inmates who were in the holding unit with him.

<u>Inmate Ryan Armer</u> (doc. 16 at 7-8):  Inmate Armer was in the same holding cell as the plaintiff.  About an hour after the plaintiff arrived in the holding cell, his eye was swollen closed and the front and back of his head were swelling up.  The plaintiff stated the room was hot and spinning.  He started throwing up and asked the other inmates to get the officers.  The inmates started yelling and Sgt. Howard responded.   Inmate Armer told Sgt. Howard that the plaintiff needed to see a doctor and was throwing up, and the plaintiff said he hurt and needed a doctor or a nurse and could not wait.  Sgt. Howard left and the plaintiff continued to throw up. Sgt Howard returned and stated he had talked to the warden, that the plaintiff

would have to wait until a nurse came in two or three hours later, and that the warden said he called the nurse and told her to come in early. The plaintiff said they are supposed to be sent to Limestone[4] for off hours medical care and Sgt. Howard responded that it was not his call. Sgt. Howard then left.

After another hour, another inmate was yelling at the plaintiff about what happened, and the plaintiff tried to say something, stood up to get some water, and said, "help." The plaintiff fell down, started shaking, and did not respond to his name being called. Therefore, inmate Armer blocked the camera to get the attention of the shift clerk, Officer Johnson. Officer Johnson came to the unit and told the inmates that if they kept messing with the camera, he would write them all disciplinaries. Armer told him to look at the plaintiff because "he done fell out and shaking" to which Officer Johnson responded that he did not care and not to mess with the camera again. The inmates started to roll the plaintiff on his side when Officers Rice and Raper came in. Officer Rice stated the plaintiff was having a seizure and needed to be rolled on his side. They got the plaintiff on his side and the plaintiff "started snoring and went to sleep." Officers Rice and Raper said the plaintiff would be all right, and left the cell.

---

[4]  The parties tacitly agree that Limestone Correctional Facility has a staffed medical unit during this time, and that inmates at Decatur Work Release were taken there for medical attention when no medical personnel were at Decatur Work Release.

The plaintiff was still on the floor at about 12:00 p.m., when Officer Smith came in.  The plaintiff was trying to talk and saying the room was spinning. Officer Smith told the other inmates to help get the plaintiff up, but the plaintiff said "they are not medical you guys help me up."  Officer Smith responded that "we aren't medical either get yourself up."  The plaintiff took about ten minutes to get off the floor by pulling himself up by grabbing the bed and the wall.  As soon as the plaintiff was upright and Officer Smith tried to help get the plaintiff out of the cell, the plaintiff began throwing up again and Officer Smith stated to the other officer "we did not know he was this messed up for real."  The plaintiff's head and eyes were so swollen he had to be guided out of the cell.

Inmate Kenneth Slaughter (doc. 16 at 9-10):

Inmate Kenneth Slaughter was also in the holding unit at Decatur Work Release the morning of March 6, 2016.  Although he was in another cell, he saw the plaintiff walk by heading to the other cell and saw when the plaintiff was taken out of that cell, trying to stand and throwing up.  He heard the plaintiff tell the inmate with whom he had fought, who was in the cell with inmate Slaughter, to stop fussing at him so he could try to get the officers back because his eye was swollen shut and his head was hurting.  The inmates in the cell with the plaintiff yelled for the officers, who came back, and the inmates asked them to take the plaintiff to a doctor.  The officers came back with Sgt. Howard, and the plaintiff

asked for an ice pack and a doctor.  Sgt. Howard left, came back, and said that Warden Noe told him the plaintiff could wait on the nurse to come in.  The plaintiff said they were supposed to be taken to Limestone when no nurse was available at Decatur Work Release.  Sgt. Howard then left.

About an hour later, the inmates with the plaintiff began yelling and Officer Johnson came in and told them to stop blocking the cameras or he would write them up.  The other inmates said that the plaintiff was throwing up and Johnson responded that he did not care.  A few hours later, the inmates again started yelling that the plaintiff had fallen and was having a seizure, and a lot of officers came back.  Slaughter saw Officers Rice and Raper and heard them say the plaintiff was having a seizure and to get him on his side.  They left about twenty minutes later and Officer Smith and another officer came back and got the plaintiff, who was throwing up.  Inmate Slaughter heard Officer Smith say he did not know it was that serious.  When they took the plaintiff out, one eye was swollen closed and the other was barely open.

The defendants' versions of the events March 6, 2016, differ from the plaintiff's.  The defendants' statements are summarized below:

Defendant Guy Noe (Doc. 13-7):  Defendant Warden Noe received the initial report of the altercation between the plaintiff and another inmate from Sgt. Howard.  Howard told him the inmates had only minor injuries.  At 11:45 a.m.,

Howard informed him that the plaintiff was complaining of a headache and dizziness and that a nurse would not arrive at Decatur Work Release until 12:30 p.m.   Therefore, Noe authorized Howard to have the plaintiff taken to Limestone Correctional Facility for medical attention.   The medical staff at Limestone decided the plaintiff needed to be taken to Decatur Hospital to be evaluated by a doctor.   The plaintiff was treated and released back to Limestone Correctional Facility for medical observation until he was cleared by the doctor at Limestone to return to Decatur Work Release.[5]

Defendant Bradley Howard (Doc. 13-8):  After the altercation on March 6, 2016, the plaintiff was brought to the shift commander's office for questioning. Sgt. Howard was the shift commander.  Howard told Officer Odell to take pictures of the plaintiff.   He asked the plaintiff if he was "o.k." and the plaintiff said he was.  About 7:20 a.m., Sgt. Howard informed Warden Noe of the incident and Noe told Howard to investigate, drug test, get a medical examination and put the plaintiff in a holding unit.   Noe was informed that medical personal would not arrive at Decatur Work Release until about 12:30 p.m.  The plaintiff asked for an ice pack and Sgt. Howard told Officer Odell to get the plaintiff an ice pack.  The plaintiff again stated he was "o.k."  Sgt. Howard returned to the visitation yard where he was the supervisor, until 11:35 a.m., when Officer Steve Johnson told

---

[5] Conspicuously absent from the records submitted by the defendants are any medical records from Decatur Hospital or Limestone Correctional Facility.

him that the plaintiff was complaining of a headache and dizziness.  Sgt. Howard conveyed this to Warden Noe, and Noe told him to have the plaintiff taken to Limestone Correctional Facility for a medical examination.   Sgt. Howard instructed Officer Brandon Smith to transport the plaintiff.   Medical staff at Limestone believed the plaintiff needed to be evaluated by a doctor, so the plaintiff was taken to Decatur Hospital, where he was treated and released.  Sgt. Howard does not have the authority to send inmates off property for medical care without a warden's permission.

Defendant Nathan Odell (Doc. 13-9):   Officer Odell responded to a call around 7:15 a.m. on March 6, 2016, concerning a physical altercation between the plaintiff and another inmate.  Officer Odell and another officer took the plaintiff to the shift office where Odell informed the shift commander, Sgt. Howard, of the incident.   According to Odell, Howard asked the plaintiff multiple times if he needed medical attention and the plaintiff stated no.  The plaintiff requested an ice pack and Officer Odell got him one.

Defendant Steve Johnson (Doc. 13-10):  Officer Johnson states that when he saw the plaintiff, the plaintiff was alert and responsive.  Officer Johnson told the inmates in the holding cell they would be disciplined if they continued to tamper with the camera.

Defendant Jeremy Rice (Doc. 13-11):  Officer Rice was radioed by Sgt. Howard to check the holding unit because the inmates in that cell were yelling. When he entered the unit, he saw the plaintiff on the floor complaining of dizziness.  Officer Rice told Sgt. Howard and requested assistance.  Officer Raper, Sgt. Howard and Rice entered the holding unit to observe the plaintiff's condition. Sgt. Howard then contacted Warden Noe, and the plaintiff was transported for evaluation by medical staff.

Defendant Scott Raper (Doc. 13-12)

At approximately 11:35 a.m., defendant Raper responded to a radio call that an inmate was having a medical issue in the holding unit.  When he arrived at 11:37 a.m., he saw the plaintiff lying on his side.  Officer Raper told another inmate to roll the plaintiff over and get him in a seated position.  He asked the plaintiff if he was "o.k." and the plaintiff said he was.  Sgt. Howard then told Officer Raper to return to his post in the visitation yard.

The parties agree that the plaintiff was taken to Limestone Correctional Facility at approximately 12:15 p.m.  (Doc. 1 at 5; doc. 8 at 4; doc. 13-2 at 2). According to the plaintiff, the nurse there stated "you guys were supposed to get him to a free world hospital.  Look at his bleeding head wound.  Get him to a

hospital now." (Doc. 1 at 5). The plaintiff was then taken to Decatur Hospital.[6] (Doc. 8 at 4). An MRI found a severe concussion and busted blood vessels. (Doc. 1 at 3). The plaintiff was in medical observation at Limestone Correctional Facility's health care unit for five days with a severe concussion, busted blood vessels, and both eyes swollen shut. (*Id.*, at 5). The plaintiff asserts that defendants Howard, Johnson, Odell and non-party Brian Smith tried to make a deal with him to not pursue this action in exchange for them not initiating disciplinary action against him.[7] (*Id.*). The plaintiff claims he continues to suffer from headaches and seizures due to this incident. (*Id.*, at 3).

Although the defendants do not dispute that the plaintiff suffered from head trauma, they assert he sustained further and more severe head injuries in an

---

[6]  A body chart of the plaintiff completed on March 6, 2016, at 5:40 p.m., reflects that the plaintiff was seen at Decatur Hospital. (Doc. 13-2 at 4). However, no records of the plaintiff's visit to Decatur Hospital or records upon his return to Limestone Correctional Facility, other than the body chart, have been placed in evidence. Although the defendants assert by way of explanation that "there are no medical records from the free-world upon his return on March 11, 2016, the exhibit defendants cite is related to the plaintiff's May 9, 2016, emergency room visit and has nothing to do with his March 2016 emergency room visit. Moreover, the document cited by defendants reflects that the missing records from the May 2016 visit were located. (Doc. 13-3 at 10). In fact the "3-11" notation defendants cite as being the date of the plaintiff's return "from the free world" actually states, "[h]e arrived back on the 3-11 shift" on May 9, 2016. *Id.* There is actual medical evidence identifying the nature or extent of injury plaintiff suffered on March 11, 2016. It is noted that, after being seen at Decatur Hospital, he was released back to prison officials the same day; he was not hospitalized.

[7]  According to the defendants, the plaintiff was placed in the holding unit because he was going to be disciplined for fighting. (Doc. 13 at 4; doc. 13-2 at 2). In his response to the defendants' motion, the plaintiff asserts he was never disciplined for fighting, as evidence in support of his claim that the defendants tried to make a deal with him. (Doc. 16 at 2).

altercation on May 9, 2016.[8]   (Doc. 13-3 at 5-6, 8).  Medical records reflect that on

May 9, 2016, the plaintiff was transported by EMS to an emergency room for an

immediate evaluation due to "severe head trauma."  (Doc. 13-3 at 4).  On June 2,

2016, the plaintiff completed a sick call request in which he stated that he

"reinjured" the concussion he received on March 6, 2016, during the May 9, 2016,

fight, when he also broke his nose.  (Doc. 13-4 at 19).  Other medical records also

reflect that the plaintiff received multiple blows to the head in both the March 6

and the May 9 incidents.  (Doc. 13-5 at 13).  He complained of dizziness and

trouble keeping his balance.  (*Id*.).  In July 2016, the plaintiff was placed on

Antivert for dizziness.  (Doc. 13-5 at 4).

## IV. Analysis

### A.  *Deliberate Indifference*

Deliberate indifference to an inmate's serious medical needs violates the

Eighth Amendment's prohibition against cruel and unusual punishment.  *Estelle v.

Gamble*, 429 U.S. 97, 104 (1976).  However, not every claim by a prisoner that he

has not received adequate medical treatment will state an Eighth Amendment

violation.  *Id*., 429 U.S. at 105.  Specifically, negligence in treating a medical

condition, including "an inadvertent failure to provide adequate medical care,"

---

[8]   As of May 9, 2016, the plaintiff was housed in Draper Correctional Facility, in Elmore, Alabama.  Clearly, the medical records related to the May 9 incident offer little or no information about plaintiff's condition following the prior March incident that is the subject of this action.

does not state a valid claim for deliberate indifference. *Id*. at 105–06. *See also Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (merely accidental inadequacy is insufficient to state a claim under the Eighth Amendment). Even medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *Estelle,* 429 U.S. at 106; *see also Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994).

Rather, for deliberate indifference the plaintiff must allege facts to meet both an objective and a subjective component. *Bingham*, 654 F.3d at 1175. First, the plaintiff must demonstrate that he has an "objectively serious medical need" that was either "diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation omitted). Alternatively, a serious medical need is determined by whether a delay in treatment worsened the condition. *Mann v. Taser Int'l, Inc*., 588 F.3d 1291, 1307 (11th Cir. 2009). The medical need must pose "a substantial risk of serious harm" if left unattended. *Farrow*, 320 F.3d at 1243 (internal quotation omitted). A "successful constitutional claim for 'immediate or emergency medical attention' requires 'medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem.'" *Fernandez v. Metro Dade*

*Police Dept.*, 397 Fed.App'x 507, 511-12 (11th Cir. 2010) (*quoting Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187-88 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002). Even "where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir.1999).

To satisfy the subjective component, the plaintiff must establish that the official acted with "deliberate indifference" to the medical need. *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010). Deliberate indifference has three requirements: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Id.* (internal quotation omitted). Medical treatment violates the Eighth Amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).

For purposes of this opinion, the court is not persuaded that head trauma[9]

---

[9] The plaintiff asserts he had a bleeding head wound (doc. 1 at 5), while the defendants claim he did not. (Doc. 13 at 11). For purposes of this opinion, whether or not the plaintiff's head was bleeding does not impact the "objectively serious medical need" prong. Severe blows to the

involving minor facial swelling consistent with a fight, coupled with vomiting and dizziness, satisfies the showing of an "objectively serious medical need" that "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow*, 320 F.3d at 1243.[10]   Moreover, the parties do not dispute that medical care for the plaintiff was delayed because no medical staff was on duty at Decatur Work Release the morning of March 6, 2016.

As to the subjective prong of the analysis, the plaintiff can establish that the defendants had subjective knowledge of a risk of serious harm by demonstrating that the defendants knew the plaintiff needed medical care and intentionally delayed that care.  *Goebert*, 510 F.3d at 1327-28.  "[A] defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference." *Bingham*, 654 F.3d at 1176.  The question of whether a delay in receiving treatment worsened an individual's condition overlaps with the causation inquiry. *Goebert,* 510 F.3d at 1329.  However "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical

_____

head, with or without bleeding, are sufficient to satisfy the "objectively serious" prong.  The defendants point to photographs of the plaintiff taken before he was placed in the holding unit as evidence that the plaintiff had no bleeding head wound.  (Doc. 13 at 3).  However, the defendants admit "the pictures taken immediately after the fact show swelling . . . ." (*Id.*). Plaintiff's complaint, however, is not that he had a bleeding head wound, but that he suffered a concussion, causing him dizziness, headaches, and seizures.

[10]   The court agrees, however, that the advent of seizures necessarily changed the way plaintiff's injuries had to be assessed.  While facial swelling and even dizziness and vomiting can be seen reasonably as relatively minor, non-serious medical conditions, seizures cannot be treated as minor.

evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *McDaniels v. Lee*, 405 Fed.App'x 456, 458–59 (11th Cir. 2010) (*quoting Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002)).

1. Defendant Officer Odell

The undisputed evidence demonstrates that Officer Odell responded to a call around 7:15 a.m. on March 6, 2016, concerning the physical altercation between the plaintiff and another inmate, and that Odell and another officer took the plaintiff to the shift office where Odell informed the shift commander, Sgt. Howard, of the incident. (Doc. 13-9). While in the shift commander's officer, the plaintiff asked for an ice pack and Officer Odell got him one. (*Id.*). No evidence supports a finding that Odell had any further contact with the plaintiff on March 6, 2016. Because the plaintiff has not presented any evidence that Odell subjectively knew of the plaintiff's deteriorating condition or need for medical attention, Odell could not have been deliberately indifferent to the plaintiff's medical needs. Defendant Odell is therefore due to have summary judgment granted in his favor.

2. Defendants Officer Rice and Officer Raper

The factual allegations concerning these two officers support a finding that neither Rice nor Raper had any contact with the plaintiff on the morning of March 6, 2016, prior to when they entered the holding unit and found the plaintiff

on the floor, at approximately 11:35 a.m.   Shortly thereafter, Sgt. Howard contacted Warden Noe again for permission to seek medical attention for the plaintiff.   Viewing this evidence in the light most favorable to the plaintiff and drawing all reasonable inferences therefrom, Rice and Raper did not exhibit deliberate indifference to the plaintiff once they subjectively knew of his medical condition.   No evidence suggests that these two defendants had any authority to independently take the plaintiff off-site for treatment.   Rather, they were required to report to defendant Howard, who had already been told by defendant Noe that the plaintiff would have to wait until the nurse arrived.   Shortly after Rice and Raper left the plaintiff's cell, the plaintiff was taken to Limestone Correctional Facility for medical treatment.   The plaintiff has not provided any evidence that these two defendants ignored a risk of which they were aware.   *See e.g., Richardson*, 598 F.3d at 737 (deliberate indifference requires disregard of a risk); *Goebert*, 510 F.3d at 1327-28 (deliberate indifference requires that the defendants knew the plaintiff needed medical care and intentionally delayed that care).

Moreover, by some accounts, Sgt. Howard was with Raper and Rice in the plaintiff's cell.  The parties do not dispute that this was somewhere between 11:30 a.m., and 12:00 p.m., and that Sgt. Howard contacted Warden Noe during this time to repeat his request for permission to take the plaintiff to Limestone rather than

waiting on the nurse's arrival at Decatur Work Release.[11]   Based on the evidence

before the court, defendants Rice and Raper are due to have summary judgment

granted in their favor.

   3. Officer Johnson

Sgt. Howard stated that he was in the visitation yard until 11:35 a.m., when

Officer Johnson told him the plaintiff was complaining of a headache and

dizziness.  (Doc. 13-8).   While the inmate witnesses and the plaintiff assert Officer

Johnson told the inmates to stop blocking the camera and that he stated "I don't

care" in response to their concerns about the plaintiff's condition (doc. 1 at 5), the

evidence before the court suggests that Johnson contacted Sgt. Howard because of

the plaintiff's condition.   When Sgt. Howard arrived, the plaintiff and other

inmates told Howard that the plaintiff needed medical attention, and Howard

responded that Warden Noe said he had to wait on the nurse to come in.  (Doc. 1 at

3, 5; doc. 16 at 7, 9).  Clearly, Officer Johnson could not unilaterally decide to send

the plaintiff off-site for medical care.  The evidence before the court supports a

finding that only Warden Noe had the authority to order the plaintiff transported

off-site, and only Sgt. Howard had the authority to contact him.  Thus, even given

---

[11]  The defendants argue that the plaintiff did not require medical care prior to when Rice entered
the cell with Howard and Raper.  The defendants state "[d]ue to the condition then witnessed at
that time, it was suited to send the Plaintiff to be transported for medical evaluation." (Doc. 13 at
7; *see also* doc. 13 at 9 ("The undisputed facts of this case described with a proper time line  . . .
indicate that none of the Defendants had the requisite knowledge of a risk of harm to the Plaintiff
 . . . .")).

the plaintiff and other inmates' sworn statements concerning Johnson, the only action Johnson could take was reporting the plaintiff's condition to Sgt. Howard, which he did.   Therefore, defendant Johnson is due to have summary judgment granted in his favor.

4. <u>Warden Noe and Sergeant Howard</u>:

Taking the facts of this case in the light most favorable to the plaintiff, and drawing all reasonable inferences therefrom, the plaintiff was involved in a fight with another inmate at around 7:30 a.m.  Officer Mears (who is not named as a defendant in this action) broke up the fight, handcuffed the plaintiff, and took him the shift commander's office.   Sgt. Howard was the shift commander and he received the report of the fight from Officer Mears.  Although plaintiff had obvious injuries, such as swelling to his face and eyes, there was nothing to indicate that he suffered any "severe" head trauma.  He was walking and talking and indicated to Sgt. Howard that he was "o.k."   Sgt. Howard then reported the incident to Warden Noe sometime between 7:30 and 8:00 a.m.  Warden Noe instructed him to get urine samples from the prisoners involved, get them any medical attention they needed, and put them in holding cells pending disciplinary action.  Sgt. Howard pointed out to the warden that the on-call nurse would not arrive for several more hours, around 12:30 p.m., but Warden Noe said the plaintiff could wait until then

for medical attention.  Sgt. Howard then put the plaintiff in a holding cell with several other inmates and returned to his assigned station on the visitation yard.

At this point the plaintiff's evidence varies from that of the defendants.  Sgt. Howard testified that he remained on the visitation yard and heard nothing else about the plaintiff's condition until 11:35, when Officer Johnson informed him that the plaintiff was dizzy and throwing up.  The plaintiff's evidence, through the affidavits of inmates Armer and Slaughter, establishes that after plaintiff had been in the holding cell for about an hour, he began to experience dizziness and vomiting.  Sgt. Howard came back to the holding cell and told plaintiff that the warden would not authorize his transfer to Limestone for medical treatment.  He said the warden had called the nurse to tell her to come in early.  He told plaintiff that he had to wait for the on-call nurse to arrive in a couple of hours, but the plaintiff argued that SOPs required that he be transported to Limestone to be checked.  (Doc. 16 at 7, 9).  At that point, plaintiff was conscious, standing, and speaking to the sergeant.  Sgt. Howard offered plaintiff an ice bag and left.

Sgt. Howard next returned to the holding cell when he was notified by Officer Johnson that plaintiff continued to be dizzy, vomiting, and had "fallen out." This was approximately 11:30 a.m.  Sgt. Howard and Officers Raper and Rice went to the holding cell and determined that the plaintiff had suffered a seizure.  At that point, Sgt. Howard reported these developments to Warden Noe, who

authorized the plaintiff's transfer to the medical unit at Limestone.  By 12:15 p.m.

plaintiff was transported to Limestone.

At the outset, it is important to note that not every injury suffered by a

prisoner requires immediate emergency medical treatment.   Frequently, what

appear to be minor injuries are recognized as serious only with the benefit of

hindsight.  That may be said of this case.  When Sgt. Howard first spoke with the

plaintiff, he had obvious but minor injuries consistent with a fight.[12]  He had facial

swelling, but gave no indication of dizziness, nausea, or other problems.  He was

alert, walking, and talking lucidly.   There was no reason for Sgt. Howard to

suspect that plaintiff had suffered any injuries more serious than swollen eyes and

swelling on his face.[13]   In any event, Sgt. Howard reported the incident to the

warden, who expressly instructed him to await the arrival of the nurse later that

day.  Later, even after Sgt. Howard became aware that that the plaintiff was dizzy

---

[12]   According to plaintiff's evidence, he told another inmate that he had been kicked in the head
by an inmate wearing steel-toed boots (*see* Aff. of Armer, Doc. 16, p. 7), but there is no evidence
that he reported this to any of the defendants, or that they had any reason to know this fact.

[13]   Indeed, there still is no "verifying medical evidence" in the record that plaintiff suffered any
serious injury.  Although he contends he suffered a concussion and broken blood vessels in his
eyes, there is medical evidence of that fact in the record.  It is the plaintiff's burden, not the
defendants, to secure the evidence necessary to show that the delay in treatment exacerbated his
injuries.  Even drawing the inference in favor of the plaintiff that his five-day stay in the
Limestone medical unit for observation after the incident suggests a serious head injury, this is
just hindsight that Sgt. Howard could not have known of at the time he made his decisions.  This
evidence cannot establish that Sgt. Howard not only *should* have known that plaintiff had a
serious injury, but indeed that he *did* know, which is required for a showing of deliberate
indifference.

and vomiting, there is no evidence that he drew the actual conclusion that plaintiff had a serious medical condition.  Again, in that second conversation,[14] the plaintiff was conscious, alert, and talking to Sgt. Howard, even if he expressed problems with dizziness and vomiting.  Finally, on the third occasion, when Sgt. Howard returned to the holding cell with Officers Rice and Raper and determined that the plaintiff likely had suffered a seizure, he contacted the warden again for authorization to transport the plaintiff to Limestone for medical treatment, which the Warden Noe granted.

As discussed above, to show that a prison official is deliberately indifferent to a serious medical need, the plaintiff must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."  *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010); *compare Lancaster v. Monroe County, Ala.,* 116 F.3d 1419, 1427–28 (11th Cir. 1997) (finding a constitutional violations and denying qualified immunity where "a jury reasonably could find that: (1) each of the individual defendants knew [the plaintiff] had urgent medical needs that would be significantly exacerbated by

---

[14]   The evidence relating to Howard's interactions with the plaintiff is very confused.  Howard testified that he talked to the plaintiff immediately before he was placed in the holding cell, and did not speak to him again until around 11:30, when Howard was notified that the plaintiff had suffered a seizure.  Inmate Armer testified, however, that Sgt. Howard came to the holding cell three times: first, when plaintiff was put in the cell; second, about an hour later when plaintiff was dizzy and had vomited; and third, when he came with Officers Rice and Raper when the plaintiff was having an apparent seizure.  The plaintiff himself does not clearly describe how many times he talked to Sgt. Howard.  The best version of the evidence from the plaintiff's perspective is inmate Armer's.

delay, and (2) each of the defendants delayed obtaining treatment for [the plaintiff] until after he suffered a seizure."). There is no evidence that Sgt. Howard possessed actual *subjective* knowledge that the plaintiff was at risk for a serious medical condition. Based on what Sgt. Howard knew at the time—that plaintiff had been in a fight and had facial swelling, dizziness, and vomiting—a reasonable jury could not infer that Sgt. Howard reached the actual conclusion that plaintiff's medical condition was so serious he could not await the arrival of a nurse in two to three hours. When he finally *did* reach that understanding—on the third visit to the holding cell, after plaintiff suffered a seizure—he acted by calling the warden to seek authorization to transport the plaintiff to a medical facility. Even if one might be critical of Sgt. Howard's failure to follow up with the warden on the second occasion, upon discovery that the plaintiff had vomited, that can be nothing more than negligence in light of the instruction he already had received from the warden to wait for the nurse to arrive.

This is not a case where the nature and extent to the inmate's injury was obvious. Unlike *Brown v. Hughes*, 894 F.2d 1533, 1538-39 (11th Cir. 1990) (delay of a few hours in providing care for a painful *broken* foot is sufficient to state a constitutional claim) and *Aldridge v. Montgomery*, 753 F.2d 970, 972–73 (11th Cir. 1985) (delay of two and one-half hours in treating *bleeding* one and one-half inch cut above the eye could constitute deliberate indifference), this plaintiff had

only minor facial swelling, dizziness, and vomiting, which do not in themselves demonstrate a medical condition so serious that treatment cannot wait two or three hours for a nurse to arrive.  Certainly, when plaintiff suffered an apparent seizure, any reasonable person then would have to believe that immediate medical attention was necessary, and Sgt. Howard acted to obtain that attention.  Sgt. Howard's motion for summary judgment is due to be GRANTED.

The same is true as to Warden Noe.  The evidence of his involvement is limited to no more than three conversations with Sgt. Howard.  First, Warden Noe received Sgt. Howard's report about the fight.  At that time, not only did Sgt. Howard have no reason to be believe the plaintiff needed immediate emergency medical attention, Warden Noe received no information in the report that should have alerted him to the need for immediate attention.  In light of the information he possessed, it was reasonable for Warden Noe to instruct the sergeant to wait for the nurse to arrive in a few hours, rather than transport the plaintiff to the Limestone medical unit.  It certainly was not deliberate indifference to a serious medical condition actually known to him.  The next time Warden Noe learned anything about the plaintiff's medical condition was a couple of hours later, when Sgt. Howard purportedly (both defendants deny this occurred) reported that the plaintiff's condition had worsened to involve dizziness and vomiting.  Again, Warden Noe instructed Sgt. Howard to await the arrival of the nurse, and Warden

Noe called the nurse to come in early.  Even if it was negligent for Warden Noe to belief summoning the nurse to come in early was sufficient, it was not deliberate indifference.  Finally, at around 11:30 that morning, Sgt. Howard reported that the plaintiff had suffered a seizure, at which time Warden Noe immediately authorized the plaintiff's transfer to the Limestone medical unit.  When Warden Noe actually became aware of a serious medical problem, he was not deliberately indifferent to it, but acted in the only manner available to him by transporting the plaintiff to the Limestone medical unit.  He too is entitled to summary judgment, and his motion should be GRANTED.

### B. Qualified Immunity

Alternative, even if the court were to find that the plaintiff has put into evidence facts sufficient for a reasonable trier of fact to conclude that a violation of the his constitutional rights occurred, the court must next consider whether either Sgt. Howard or Warden Noe is entitled to summary judgment on the basis of qualified immunity. "Qualified immunity is a guarantee of fair warning." *McElligott*, 182 F.3d at 1260.  It "protects government officials performing discretionary functions from liability if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1327 (11th Cir. 2003) (*quoting Hope v. Pelzer*, 536 U.S. 730, (2002)).  Qualified immunity

provides immunity from suit rather than a defense to liability, and "it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To receive qualified immunity, a government official must first prove that he was acting within his discretionary authority. *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003). From there, the burden shifts to the plaintiff to show qualified immunity should not apply. *Lee v. Ferrara*, 284 F.3d 1188, 1194 (11th Cir. 2002). The Supreme Court has created a two-part test for making this determination. First, the court must determine whether the plaintiff's allegations, if true, show the officer's conduct violated a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *Gonzalez,* 325 F.3d at 1234. The second prong of the test requires the court to determine whether the right was "clearly established" at the time of the violation. *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009) (*quoting Saucier v. Katz,* 533 U.S. 194, 201 (2001)). These two determinations may be made in either order at the discretion of the court. *Lewis*, 561 F.3d at 1291 (*citing Pearson v. Callahan*, 555 U.S. 223 (2009)).

Here, Warden Noe and Sgt. Howard were acting within their discretionary authority at all relevant times. Assuming for purposes of this analysis that the delay in providing the plaintiff medical care violated the plaintiff's constitutional rights, the court must examine whether the law was clearly established before

28

March 6, 2016, that delaying care for an apparent head injury violated the plaintiff's rights. *Lewis*, 561 F.3d at 1291 (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

"For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about) the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Jenkins by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 823 (11th Cir. 1997) (*quoting Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1150 (11th Cir. 1994)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent." *McElligott*, 182 F.3d at 1260 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted)). Officials can "be on notice that their conduct violated established law even in novel circumstances." *Hope*, 536 U.S. at 741.

The court is not persuaded that clearly established Eleventh Circuit or Supreme Court law put either Sgt. Howard or Warden Noe on fair notice that waiting for a nurse to arrive for treatment of facial swelling, dizziness, and vomiting following a fight, rather than transporting a prisoner to another facility, was deliberate indifference. The circumstances under which judgments must be

made about when and how to seek medical attention for a prisoner are manifold. Whether a delay in obtaining treatment for an inmate is constitutionally intolerable requires consideration of "the reason for the delay and the nature of the medical need." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). It is sometimes not a simple proposition to determine how urgent a prisoner's medical need might be. Judgments must be made, and public officials are entitled to qualified immunity unless their judgment is so plainly wrong that only the truly incompetent or pernicious could have made it. Absent some case law with clearly similar factual circumstances, it cannot be said that these officials were on notice that the judgments they were making were necessarily in violation of the constitutional rights of the plaintiff. This case simply does not involve such "stark and simple" circumstances as those involved in other cases where the courts have found deliberate indifference due to delay in obtaining medical treatment. *See e.g., Bozeman v. Orum*, 422 F.3d 1265, 1274 (11th Cir. 2005), *abrogated on other grounds by Kingsley v. Hendrickson*, ___ U.S. ___, 135 S.Ct. 2466 (2015) (the prisoner had stopped breathing); *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1422 (11th Cir. 1997) (officers were given prior notice that the prisoner had a history of near-fatal alcoholic seizures). Even if Warden Noe or Sgt. Howard should have sought medical attention for the plaintiff sooner than they did, the court has found no sufficiently similar Eleventh Circuit, United States Supreme

Court, or Alabama Supreme Court cases that would fairly put them on notice that failing to do so was a violation of the plaintiff's rights.  Warden Noe and Sgt. Howard are entitled to qualified immunity, and their motion for summary judgment must be granted on that basis as well.

## V. Recommendation

For the reasons stated above, the undersigned **RECOMMENDS** that the defendants' motion for summary judgment (doc. 13) be **GRANTED** and that this action be **DISMISSED WITH PREJUDICE**.

## VI. Notice of Right to Object

Any party may file specific written objections to this report and recommendation.  Any objections must be filed with the Clerk of Court within fourteen (14) calendar days from the date the report and recommendation is entered.   Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objection. Failure to object to factual findings will bar later review of those findings, except for plain error.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013).  Objections also should specifically identify all claims contained in the complaint which the report and recommendation fails to address. Objections should not contain new allegations, present additional evidence, or

repeat legal arguments.  An objecting party must serve a copy of its objections on each other party to this action.

Upon receipt of objections, a United States District Judge will make a *de novo* determination of those portions of the report and recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings of fact and recommendations made by the magistrate judge.  The district judge must conduct a hearing if required by law.  Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence.  Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record.  The district judge also may refer this action back to the magistrate judge with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may only appeal from a final judgment entered by a district judge.

The Clerk is DIRECTED to mail a copy of the foregoing to the plaintiff.

DONE this 18th day of November, 2016.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE