# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DANIEL BARTHOLOMEW CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:16-cv-00920-MHH-TMP |
| | ) | |
| GUY NOE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This prisoner civil rights action is before the Court for a review of the magistrate judge's November 18, 2016 report concerning the defendants' motion for summary judgment. In the report, the magistrate judge recommends that the Court enter judgment for the defendants on all of plaintiff Daniel Bartholomew Clark's claims. (Doc. 23). Mr. Clark has filed objections to the report (Doc. 24), and he has filed a "Writ of Mandamus/Equitable Tolling" (Doc. 26) and a "Motion to Leave to Suppl[e]ment Reply to Special Report/Objections" (Doc. 27).

The Court treats the writ of mandamus as a motion to extend the deadline for submitting additional medical records. (Doc. 26, pp. 1-2).[1] In his motion for leave

---

[1] "'[M]andamus is an extraordinary remedy which should be utilized only in the clearest and most compelling of cases.'" *Cash v. Barnhart*, 327 F.3d 1252, 1257 (11th Cir. 2003) (quoting *Carter v. Seamans*, 411 F.2d 767, 773 (5th Cir. 1969)) (alteration in *Cash*). "Mandamus relief is only appropriate when: (1) the plaintiff has a clear right to the relief requested; (2) the defendant has a clear duty to act; and (3) 'no other adequate remedy [is] available.'" *Cash*, 327 F.2d at 1258 (quoting *Jones v. Alexander*, 609 F.2d 778, 781 (5th Cir. 1980)) (alteration in *Cash*).

to supplement his reply to the special report and objections, Mr. Clark asks the Court to consider the additional medical records and other evidence. (Doc. 27, p. 1). The Court grants Mr. Clark's motion to extend the deadline to submit evidence and his motion to supplement his reply to the special report and objections. In this opinion, the Court considers Mr. Clark's objections to the report and recommendation together with the additional evidence and argument that Mr. Clark has submitted.

**STANDARD OF REVIEW**

A district court "may accept, reject, or modify, in whole or part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party objects to a report and recommendation, the district court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* The Court reviews for plain error proposed factual findings to which no objection is made, and the Court reviews propositions of law *de novo*. *Garvey v. Vaughn*, 993 F.2d 776, 779 n.9 (11th Cir. 1993); *see also United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam), *cert. denied*, 464 U.S. 1050 (1984) ("The failure to object to the magistrate's findings of fact prohibits an attack on appeal of the factual findings adopted by the district court except on grounds of plain error or

manifest injustice.") (internal citation omitted); *Macort v. Prem, Inc.*, 208 Fed. Appx. 781, 784 (11th Cir. 2006).

## DISCUSSION

### 1.    Equal Protection

Mr. Clark argues that the defendants provided insufficient security in the dorms of his prison and that the inadequate security violated his equal protection rights.  (Doc. 24, p. 2).  "To establish an equal protection claim, 'a prisoner must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and [that] (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis.'" *Muhammad v. Sapp*, 388 Fed. Appx. 892, 899 (11th Cir. 2010) (quoting *Sweet v. Sec'y Dep't of Corr.*, 467 F.3d 1311, 1318-1319 (11th Cir. 2006)) (alteration in *Muhammad*).  "[P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences. . . . It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Ashcroft v. Iqbal,* 556 U.S. 662, 676-77 (2009) (internal quotation marks, citation, and editorial marks omitted).  To demonstrate a violation of a clearly established right, a plaintiff must show that the defendants adopted and implemented the policy at issue "for the

purpose of discriminating on account of race, religion or national origin." *Id.* at 677.

Mr. Clark has not submitted evidence to demonstrate that the defendants enforced the security policy in the dorms in a discriminatory manner. In fact, Mr. Clark asserts that everyone in the dorm was subjected to the same inadequate protection. Therefore, Mr. Clark has not presented a viable equal protection claim, and the Court overrules Mr. Clark's first objection.

### 2. Eighth Amendment – Failure to Protect

To the extent that Mr. Clark attempts to raise a failure to protect claim under the Eighth Amendment (*see* Doc. 24, pp. 1-2), the record does not support such a claim. Under the Eighth Amendment, prison officials must "protect prisoners from violence at the hands of other prisoners." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal marks omitted)). Although prison officials have a general duty to protect inmates from violence by other prisoners, prison officials are not the guarantors of a prisoner's safety. *Morgan v. Toombs Cty., GA.*, 400 F.3d 1313, 1321 (11th Cir. 2005) (citing *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990)).

To establish a violation of the Eighth Amendment, a plaintiff must show that he faced a "substantial risk of serious harm" and that the defendants were

deliberately indifferent to that risk. *Farmer*, 511 U.S. at 834. An objective standard governs the "substantial risk of serious harm" element of the Eighth Amendment test. *Caldwell*, 748 F.3d at 1099 (citing *Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1028-29 (11th Cir. 2001) (en banc), *abrogated on other grounds in Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). The deliberate indifference element has two components, one subjective and one objective. "To satisfy the subjective component, a plaintiff must produce evidence that the defendant 'actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm.'" *Caldwell*, 748 F.3d at 1099 (quoting *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007)) (alterations in *Caldwell*). "To satisfy the objective component, a plaintiff must produce evidence that the defendant 'disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner.'" *Id.* (quoting *Rodriguez*, 508 F.3d at 617) (alteration in *Caldwell*). "[N]egligent failure to protect an inmate from attack does not justify liability under section 1983." *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003) (internal quotation marks and citation omitted). Instead, a plaintiff must demonstrate that prison officials were aware of "specific facts from which an inference could be drawn that a substantial risk of serious harm exist[ed]—and the prison official must also [have drawn] that inference." *Carter*, 352 F.3d at 1349 (internal quotation marks and citations omitted).

Mr. Clark has not produced evidence that a particular defendant was aware or should have been aware of a strong likelihood that he (Mr. Clark) would be assaulted. *See Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990). Mr. Clark has not demonstrated that anyone previously had threatened him, or that prison officials were aware that such a threat existed, that a fight was imminent, or that he feared attack. Therefore, to the extent that Mr. Clark objects to the report and recommendation based on the defendants' alleged failure to protect him from the inmate who attacked him, the Court overrules the objection.

### 3. § 1983 Conspiracy

Mr. Clark also argues that he is the victim of a conspiracy. (Doc. 24, p. 2). Mr. Clark contends that guards placed him in a holding cell pending a write up for fighting, but he never received a disciplinary report. (Doc. 24, p. 2). This bare set of facts, standing alone, is not sufficient to establish a conspiracy among the defendants. To the extent that Mr. Clark contends that absence of a disciplinary report was part of a larger scheme to cover up this incident, his claim fares no better.

To establish a § 1983 claim for conspiracy to violate constitutional rights, a plaintiff must show that "a conspiracy existed that resulted in the actual denial of some underlying constitutional right." *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010) (citing *GJR Invs., Inc. v. Cty. of Escambia*, 132 F.3d 1359,

1370 (11th Cir. 1998)). To prove a conspiracy, a plaintiff must demonstrate that the defendants "reached an understanding" to violate the plaintiff's constitutional rights. *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty.*, 956 F.2d 1112, 1122 (11th Cir. 1992) ("[T]he linchpin for conspiracy is agreement.") (internal quotation marks and citation omitted). In addition, a plaintiff "must prove an actionable wrong" to support the conspiracy claim. *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990) (internal citations omitted). "The naked assertion of conspiracy . . . without supporting operative facts" is not sufficient to prove a claim under § 1983. *Phillips v. Mashburn*, 746 F.2d 782, 785 (11th Cir. 1984). Here, Mr. Clark offers little more than a naked assertion of conspiracy.

Even if Mr. Clark had produced evidence showing a conspiratorial agreement among the defendants, the intracorporate conspiracy doctrine would undermine his § 1983 conspiracy claim. Under the intracorporate conspiracy doctrine, employees of a state agency are not legally capable of conspiring among themselves. As the Eleventh Circuit has explained:

> Under the intracorporate conspiracy doctrine, a corporation's employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation. This doctrine stems from basic agency principles that "attribute the acts of agents of a corporation to the corporation, so that all of their acts are considered to be those of a single legal actor." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 603 (5th Cir. Nov. 1981); *see also United States v. Hartley*, 678 F.2d 961, 970 (11th Cir. 1982). The reasoning behind the intracorporate conspiracy doctrine is that it is not possible for a single legal entity consisting of the corporation and its agents to

7

conspire with itself, just as it is not possible for an individual person to conspire with himself. *See Dussouy*, 660 F.2d at 603 (explaining that "the multiplicity of actors necessary to conspiracy" is negated when the agents' acts are attributed to the corporation and the corporation and its agents are viewed as a single legal actor); *Nelson Radio & Supply Co., Inc. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952) (stating that "[a] corporation cannot conspire with itself any more than a private individual can"). This doctrine has been applied not only to private corporations but also to public, government entities. *See Chambliss v. Foote*, 562 F.2d 1015 (5th Cir. 1977), *aff'g*, 421 F.Supp. 12, 15 (E.D.La.1976) (applying the intracorporate conspiracy doctrine to bar a § 1985(3) claim against a public university and its officials); *see also Wright v. Illinois Dept. of Children & Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994) (holding that the intracorporate conspiracy doctrine applies not just to private entities but also to government agencies such as the Department of Children and Family Services); *Runs After v. United States*, 766 F.2d 347, 354 (8th Cir. 1985) ("The Tribal Council as an entity or governmental body cannot conspire with itself.").

*Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000) (internal footnotes omitted).

Because each of the named defendants is a corrections officer who works for the Alabama Department of Corrections, the intracorporate conspiracy doctrine bars a conspiracy claim against the defendants. Therefore, the Court overrules Mr. Clark's objection to the report and recommendation based on allegations of a conspiracy to cover up the incident in question.

**4.     Eighth Amendment – Deliberate Indifference**

**a.     Evidentiary Objection**

Mr. Clark objects to the fact that the defendants did not produce all of the medical records relating to his March 6, 2016 head injury. (Doc. 24, pp. 2-3). In his report, the magistrate judge noted that some of Mr. Clark's medical records were missing from the court record. The magistrate judge stated: "[c]onspicuously absent from the records submitted by the defendants are any medical records from Decatur Hospital or Limestone Correctional Facility." (Doc. 23, p. 10, n.5; *see also* Doc. 23, p. 10, n.6 ("[N]o records of [Mr. Clark's] visit to Decatur Hospital or records upon his return to Limestone Correctional Facility, other than [a March 6, 2016] body chart, have been placed in the record.")). The magistrate judge's comments are not meant to suggest that the defendants were responsible for placing all of Mr. Clark's medical records in the court record. At the summary judgment stage, a plaintiff must secure the evidence necessary to support his claim. *See, e.g.*, *Spaulding v. Poitier*, 548 Fed. Appx. 587, 593 (11th Cir. 2013) (finding summary judgment proper where plaintiff "ha[d] not submitted any medical evidence to support [his] claim."); *Vicks v. Knight*, 380 Fed. Appx. 847, 852 (11th Cir. 2010) (finding summary judgment proper when he plaintiff did "not point to the existence of any medical evidence showing that he sustained an injury as a result of the alleged beating. As a result, his claim that he could corroborate his version of events at trial lacks merit . . . ."); *McDaniels v. Lee*, 405 Fed. Appx. 456, 458-59 (11th Cir. 2010) (a plaintiff "must place verifying medical

evidence in the record to establish the detrimental effect of delay in medical treatment.") (internal quotation marks and citations omitted).

The magistrate judge's observations suggest, instead, that the defendants could have provided additional medical records that would have shed light on Mr. Clark's injuries. The omission of relevant records is particularly noticeable, given the collection of irrelevant medical records that the defendants placed in the record. As the magistrate judge pointed out in his report, the defendants placed medical records from May-June 2016 in the court record to establish that Mr. Clark "sustained further and more severe head injuries in an altercation on May 9, 2016." (Doc. 23, pp. 13-14). Those records do little to inform the analysis of Mr. Clark's March 6, 2016 head injury. (*See generally* Doc. 24, p. 3) (Mr. Clark's objection that the defendants "sent 61 pages of another issue, when there are less pages in this current issue.").

Nevertheless, the defendants' selection of medical records does not alter Mr. Clark's obligation to present medical records to support his claim. In response to the defendants' motion for summary judgment, Mr. Clark submitted argument, affidavits, and evidence, including certain medical records. (Doc. 16). Mr. Clark did not ask for an opportunity to gather other medical records before the magistrate judge issued his report and recommendation. Although the Court must liberally construe *pro se* pleadings, a *pro se* litigant still must meet his burden of

establishing a genuine issue of material fact to survive summary judgment.  *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).[2]  Therefore, the Court overrules Mr. Clark's objection based on the defendants' failure to produce additional medical records.  As stated, the Court will consider the documents that Mr. Clark placed in the record after he filed his objections to the magistrate judge's report and recommendation.  (Doc. 27, pp. 3-7).

### b.     Evidence of Deliberate Indifference

Finally, Mr. Clark argues that his deliberate indifference claim should survive summary judgment.   Mr. Clark contends that after he notified a correctional officer that he (Mr. Clark) needed medical care, the defendants should have obtained care for him pursuant to the Access to Care form that is available to inmates housed at Decatur Work Release.  (Doc. 24, pp. 3-5).  In short, Mr. Clark asserts that the defendants violated prison policy.  Violations of prison policy may constitute negligence, but negligence alone does not suffice to establish deliberate indifference for purposes of a § 1983 claim.  *Davis v. Scherer*, 468 U.S. 183, 194-95 (1984) (allegation of violation of statutory or administrative provision did not provide the basis for a claim of violation of a constitutional right); *Hernandez v. Estelle*, 788 F.2d 1154, 1158 (5th Cir. 1986) (failure of prison officials to follow

---

[2] In his objections, Mr. Clark argues that it was very difficult for him to obtain his own medical records from ALDOC.  (Doc. 24, p. 3).  Assuming the truth of this argument, the point is moot because the Court finds that the record contains more than enough evidence that Mr. Clark was suffering from an objectively serious medical condition on March 6, 2016.  *See* pp. 12-14 below.

their own rules does not establish a constitutional violation). Because the failure to follow internal procedures does not establish a constitutional violation, the Court overrules Mr. Clark's objection on this ground.

Beyond this alleged violation of prison policy, Mr. Clark contends that he can establish the elements of his deliberate indifference claim based upon the totality of the evidence in the record and the evidence that he anticipates that he could develop through an evidentiary hearing. As the magistrate judge stated, to prove that the defendants were deliberately indifferent to his serious medical need, Mr. Clark must establish that he had an objectively serious medical need and that the defendants had subjective knowledge of the serious medical need, disregarded of the risk of serious harm to Mr. Clark, and did so either recklessly or intentionally but not merely negligently. (Doc. 23, pp. 15-16).

Mr. Clark has established that he had an objectively serious medical need. As Mr. Clark noted in his objections (Doc. 24, pp. 3, 6), in his affidavit, he explained that on March 6, 2016, he was "kicked in the head over his eye." (Doc. 1, p. 5). Mr. Clark asserted that his head was swelling and that he was "going in and out of consciousness." (Doc. 1, p. 5; *see also* Doc. 24, pp. 3, 12). Fellow inmates offer additional information about the extent of Mr. Clark's head injury. Ryan Armer, an inmate who was in a holding cell with Mr. Clark after the March 6, 2016 incident, testified that about an hour after Mr. Clark arrived in the holding

cell, Mr. Clark's "eye was swollen closed and [the] front and back of his head was swelling up and he kept saying it was getting hot and the room was sp[inning]. He started throwing up and asked could we get the police because he couldn't yell." (Doc. 16, p. 7). Mr. Armer stated that when Mr. Clark stood up to get some water, "he fell straight down and started shak[]ing." (Doc. 16, p. 7). Mr. Armer called Mr. Clark's name, but Mr. Clark did not respond. (Doc. 16, p. 7). Kenneth Slaughter, an inmate who, on March 6, 2016, was in a holding cell near Mr. Clark's cell, stated in his affidavit that as Mr. Clark walked past his cell, he (Mr. Slaughter) saw that Mr. Clark's face and head were swollen. (Doc. 16, p. 9). Mr. Slaughter stated that after Mr. Clark entered his holding cell, he (Mr. Slaughter) heard what sounded like vomiting coming from the cell, and the other inmates in the cell with Mr. Carter began yelling for help. (Doc. 16, p. 9).

Mr. Clark's medical records confirm that Mr. Clark experienced a severe head injury. A March 6, 2016 nurse's note from the prison infirmary states that Mr. Clark had a head wound above his left eye, and he had vomited twice after he sustained the head injury. (Doc. 27, p. 3). Similarly, an emergency department referral form states that Mr. Clark had a large hematoma over his left eye; that Mr. Clark complained of a "severe" headache; and that Mr. Clark vomited twice. (Doc. 27, p. 4). The emergency department record states that Mr. Clark reported that he had lost consciousness and had had a seizure. (Doc. 27, p. 4). According

to a March 6, 2016 incident report, when Officer Smith took Mr. Clark to the Limestone Correctional facility to see a nurse, the nurse "confirmed that [Mr.] Clark could be suffering from head trauma and needed immediate medical attention." (Doc. 27, p. 5).

Mr. Clark relies on a record from Jackson Hospital to establish that head injuries such as his March 6, 2016 injury are objectively serious. (Doc. 24, p. 3). The document instructs patients to return to the emergency room if they experience repeated vomiting or have a seizure. (Doc. 24, p. 10). In recent years, the signs and symptoms of serious head injuries have become part of the national dialogue because of the attention paid to athletes who suffer head injuries.[3] Government webpages like the webpage from the Centers for Disease Control and Prevention and private healthcare pages like the Mayo Clinic's webpage advise that an individual who sustains a head injury should seek immediate medical attention if he vomits repeatedly or has a seizure. *See*, *e.g.*, Centers for Disease Control and Prevention, *Traumatic Brain Injury & Concussion*, https://www.cdc.gov/traumaticbraininjury/symptoms.html (last visited October 17, 2017); National Institutes of Health, United States Library of Medicine, MedlinePlus, *Head Injuries*, https://medlineplus.gov/headinjuries.html (last visited

---

[3] *See, e.g.*, National Football League, *New NFL rules designed to limit head injuries* (July 26, 2012), http://www.nfl.com/news/story/09000d5d81990bdf/article/new-nfl-rules-designed-to-limit-head-injuries (last visited October 17, 2017); Michelle Castillo, *NFL, NIH collaborate on traumatic brain injury, concussion research*, CBS NEWS (December 17, 2013), https://www.cbsnews.com/news/nfl-nih-collaborate-on-traumatic-brain-injury-concussion-research/ (last visited October 17, 2017).

October 17, 2017); Mayo Clinic, *Concussion*, https://www.mayoclinic.org/diseases-conditions/concussion/symptoms-causes/syc-20355594 (last visited October 20, 2017) ("Seek emergency care for an adult or child who experiences a head injury and symptoms such as: [r]epeated vomiting . . ."). There is ample evidence in the record to establish that Mr. Clark suffered an objectively serious head injury.

With respect to the balance of the elements of his deliberate indifference claim, Mr. Clark contends in his objections that the defendants "knew [he] had been hit in the head," and that they "were well aware" that he had a serious medical need, but the defendants waited hours before seeking medical attention. (Doc. 24, p. 3). Mr. Clark argues that he requested medical attention for a head injury, that Warden Noe "knew the procedures better than anyone seeing he was a nurse with Corizon before he came to Security. He knew I was not suppose[d] to even be placed in that holding cell with any type of head injury, that I was supposed to get cleared from head injury status." (Doc. 24, p. 4; *see also* Doc. 16, pp. 1, 4).

The Corizon health policy that Mr. Clark placed in the record states that "[i]ncarcerated individuals are afforded timely access to care to meet their serious medical . . . needs in each health care unit." (Doc. 24, p. 8). In addition, "[i]n

emergency situations, you are to advise the nearest correctional officer for immediate health services activation." (Doc. 24, p. 8).

The evidence, viewed in the light most favorable to Mr. Clark, demonstrates that after prison officers disrupted a fight between Mr. Clark and another prison inmate, prison officers brought Mr. Clark to a holding cell between 7:30 and 8:00 a.m. At the time, Mr. Clark's face and head were "swollen real bad." (Doc. 16, p. 7). After Mr. Clark had been in the holding cell for approximately one hour (so at approximately 9:00 a.m.), his left eye became swollen shut, and he began vomiting. (Doc. 16, p. 7). The other inmates in the holding cell with Mr. Clark yelled for help, and Sergeant Bradley Howard responded. (Doc. 16, p. 7). Mr. Armer (again, an inmate who shared the holding cell with Mr. Clark) said to Sergeant Howard: "'Look at Clark look at his head, he needs to see a Doctor. He['s] t[h]rowing up and his eye big.'" (Doc. 16, p. 7) (interior marks in original). According to Mr. Armer, Mr. Clark told Sergeant Howard that he was hurting, and he needed to see a doctor or a nurse. Sergeant Howard left the holding cell area without obtaining medical help for Mr. Clark. (Doc. 16, p. 7).

Mr. Armer reports that after Sergeant Howard left, Mr. Clark "started throwing up real bad." (Doc. 16, p. 7). Mr. Armer and another inmate yelled again for Sergeant Howard. (Doc. 16, p. 7). Mr. Armer testified that Sergeant Howard returned and told Mr. Clark that he (Sergeant Howard) had talked to

Warden Noe, and Warden Noe told Sergeant Howard not to send Mr. Clark to Limestone but to wait for a prison nurse instead. (Doc. 16, p. 7). Sergeant Howard told Mr. Clark that a nurse would arrive in two or three hours, and Mr. Clark could see the nurse then. (Doc. 16, p. 7). Mr. Clark told Sergeant Howard that he was experiencing an emergency and that according to prison policy, inmates "are to be sent to Limestone if there is no on call nurse." (Doc. 16, p. 7). Sergeant Howard told Mr. Clark that "it was not his call," and Sergeant Howard left again. (Doc. 16, p. 7).

Approximately one hour later (meaning at approximately 10:00 a.m.), Mr. Clark stood up to get some water, and he fell and began shaking. Mr. Armer called Mr. Clark's name, but Mr. Clark did not respond. (Doc. 16, p. 7). The inmates got the attention of Shift Officer Johnson, and Officer Johnson came to the holding cell. (Doc. 16, p. 7). Mr. Armer told Officer Johnson that Mr. Clark "fell out and [was] shaking." (Doc. 16, p. 7). The inmates told Officer Johnson that Mr. Clark had been throwing up. (Doc. 16, p. 9). Officer Johnson left without providing assistance. (Doc. 16, p. 8).

Mr. Armer testified that he and other inmates rolled Mr. Clark up on his side, and then Officer Rice and Officer Raper arrived. (Doc. 16, p. 8). According to Mr. Armer, Officer Raper stated that Mr. Clark was having a seizure. (Doc. 16, pp. 8-9). Mr. Armer testified that a short time later, Officer Smith came in, and

Mr. Clark still was on the floor. (Doc. 16, p. 8). It took Mr. Clark about ten minutes "to get off the floor by grabbing the bed and the wall." (Doc. 16, p. 8). According to Mr. Armer, the prison officers who were present "stood there and just watched." (Doc. 16, p. 8). Once Mr. Clark was on his feet, Officer Smith tried to help Mr. Clark out of the cell, but Mr. Clark threw up four or five times. (Doc. 16, p. 8). Mr. Armer testified that Officer Smith said to another officer, "we did not know he was this messed up for [] real." (Doc. 16, p. 8; *see also* Doc. 16, p. 9). At this point, Mr. Clark's "head and eyes were so swollen" that guards had to help guide him from the cell because Mr. Clark could not walk straight. (Doc. 16, p. 8). The officers took Mr. Clark to Limestone Correctional facility for medical attention at approximately 12:30 p.m., more than four hours after Mr. Clark suffered his head injury. (Doc. 16, p. 8; *see also* Doc. 24, p. 14). After examining Mr. Clark, doctors at Decatur Morgan Hospital "concluded that Mr. Clark was suffering from a concussion." (Doc. 27, p. 5).[4]

Because Mr. Clark has established that there was a four-hour delay before prison officers sought medical treatment for his serious head injury, Mr. Clark's

---

[4] The respondents placed in the record a collection of affidavits that provide the respondents' version of the events on March 6, 2016. (Docs. 13-7, 13-8, 13-9, 13-10, 13-11, 13-12; *see generally* Doc. 23, pp. 10-12). Viewed collectively, the affidavits indicate that Mr. Clark showed no sign of having suffered a significant head injury until he complained of dizziness to Officer Rice. (Doc. 13-11, pp. 1-2; Doc. 13-7, p. 1; Doc. 13-8, p. 2). None of the defendants' accounts indicate that Mr. Clark vomited or experienced the symptoms of a seizure. Because the Court must view the evidence in the record in the light most favorable to Mr. Clark at this stage of the proceedings (*see* Doc. 23, p. 3), the Court accepts as true Mr. Clark's version of events.

deliberate indifference claim turns on his ability to prove that the defendants subjectively were aware of the risk that he faced because of a delay in treatment. *Caldwell*, 748 F.3d at 1099 (to establish the subjective component of deliberate indifference, a plaintiff must prove that the defendant "'actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm.'") (quoting *Rodriguez*, 508 F.3d at 716) (alterations in *Caldwell*). Here, Mr. Clark's claim falters.

First, although Mr. Clark reported in his affidavit that he was kicked in the head, there is no evidence in the record that he told Officer Odell or the other prison officer who broke up the March 6, 2016 fight and took Mr. Clark to a holding cell that the inmate with whom he (Mr. Clark) fought kicked him in the head. Viewed in the light most favorable to Mr. Clark, the evidence indicates that when he arrived at the holding cell, his face and head were swollen (*see* pp. 12-13, 15-16 above), consistent with a fight, but there were no other signs of a serious head injury that needed immediate medical attention. Because there is no evidence that Officer Odell had additional contact with Mr. Clark on March 6, 2016 (Doc. 13-9, p. 1), Officer Odell is entitled to judgment on Mr. Clark's deliberate indifference claim as a matter of law.

Likewise, Officers Rice and Raper are entitled to judgment on Mr. Clark's claim because inmates Armer and Slaughter acknowledged that when those

officers arrived at the holding cell after Mr. Clark had a seizure, the officers took steps to assist Mr. Clark. As the magistrate judge stated, there is no evidence that Officer Rice or Raper had contact with Mr. Clark earlier in the day, and Mr. Clark was taken to Limestone Correctional Facility for a medical examination shortly after Officers Rice and Raper encountered Mr. Clark. Moreover, inmates Armer and Slaughter acknowledge that a third officer, Officer Smith, who arrived at the holding cell after Mr. Clark had a seizure stated that the officers did not realize the extent of Mr. Clark's injury. (*See* Doc. 16, p. 8 (stating that Officer Smith remarked "we did not know he was this messed up for real."); Doc. 16, p. 10 (explaining that Officer Smith stated "We didn't know it was this serious. Look at all that throw up he bad [sic].")).

Sergeant Howard and Officer Johnson – and Warden Noe by extension – are in a different position, again assuming the truth of the evidence presented by Mr. Clark and inmates Armer and Slaughter. These officers knew that Mr. Clark had a head injury, and they knew, by approximately 10:00 a.m., that Mr. Clark had vomited repeatedly. Sergeant Howard knew that Mr. Clark told him that his injury was an emergency, and he needed help. Officer Johnson knew that Mr. Clark had fallen on the floor and was shaking. Sergeant Howard conveyed the information he had to Warden Noe. Thus, these officers actually had information – that is, they

subjectively knew information – that should have caused them to seek immediate medical attention for Mr. Clark sooner.

Under the particular circumstances of this case, the Court cannot find that the officers' failure to act sooner is more than negligent conduct. The magistrate judge stated that he was "not persuaded that head trauma involving minor facial swelling consistent with a fight, coupled with vomiting and dizziness, satisfies the showing of an 'objectively serious medical need.'" (Doc. 23, pp. 16-17). The magistrate judge added that "the advent of seizures necessarily changed the way plaintiff's injuries had to be assessed. While facial swelling and even dizziness and vomiting can be seen reasonably as relatively minor, non-serious medical conditions, seizures cannot be treated as minor." (Doc. 23, p. 17, n. 10). The undersigned agrees that a seizure following a head injury cannot be treated as minor, but the undersigned, based on the publicly-available medical literature cited above on pp. 14-15, respectfully departs from the magistrate judge's conclusion that vomiting following a head injury is a relatively minor situation. Based on the publicly-available medical literature, the undersigned finds that vomiting following a head injury requires immediate medical attention, and the combination of a head injury with vomiting constitutes an objectively serious medical condition. Given this disagreement between two officers of this Court, the undersigned must conclude as a matter of law, still viewing the evidence in the light most favorable

to Mr. Clark, that Warden Noe, Sergeant Harper, and Officer Johnson were, at worst, negligent in failing to provide immediate medical attention to Mr. Clark when they became aware that Mr. Clark had been vomiting after he suffered a head injury. Therefore, these defendants are entitled to summary judgment on Mr. Clark's deliberate indifference claim.

**CONCLUSION**

Having reviewed and considered *de novo* the materials in the record, Mr. Clark's objections, and Mr. Clark's newly submitted evidence and arguments, the Court finds that the defendants are entitled to judgment in their favor on Mr. Clark's claims.

By separate order, the Court will enter judgment in favor of the defendants.

**DONE** and **ORDERED** this October 20, 2017.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE